STORY, Circuit Justice.
The present bill is brought by Gass to be relieved from his suretyship and liability under the bond given to Stinson, upon several grounds. In the first place, he insists, that the nature and character of the suretyship were essentially changed after the execution of the bond, without his consent, by a contract (commonly called a contract of sale and return), by which in effect James, instead of a mere agent, became a conditional purchaser of the granite, liable, if he sold it for certain stipulated prices, and for all the bad debts contracted under his own sales, however faithful might be nis conduct, in the course of his agency. In the next place he insists, that he did give notice of his dissatisfaction at remaining surety to Stinson, who waived any formal nofice; and he was thereupon entitled to be discharged from all liability for the future agency of James. In the third place he insists, that a bond with new sureties was accepted from James with the avowed understanding of its being a substitute for that originally given by Gass. In the fourth place, he insists that a certain contract, called the New Orleans contract, by which James and another engaged to furnish granite for building a bank at New Orleans. which was made known to and acted upon by Stinson, and for which the granite, charged in the account against James, was furnished by Stinson, is in no sense a contract or proceeding appertaining to the agency, for which Gass is liable under his bond. All these various matters are insisted upon in some form or other in the charges in the bill, and in the argument at the- bar on behalf of Gass, and they are all denied in the answer and in the argumént on the other side.
Before -proceeding to a consideration of these matters, thus put directly in contestation by the parties, it is necessary to dispose of one or two preliminary points, which grow out of the collateral agreement stated in the case, as to the obligation and construction of that paper. It is contended by Stinson that he never gave any authority to the deputy warden to sign any such paper; and, that it was not a part of the original contract with Gass at the time of executing it, but was a subsequent unauthorized proceeding. And it is further contended, that the true interpretation of the agreement, if valid, is, that the settling of the accounts of the agency, paying the balance, and delivering over the property of the prison in the hands of James, constitute a condition precedent to the right of Gass to avail himself of the written notice. It appears to me, that the true and reasonable interpretation of the instrument is, that Gass upon giving the ten days notice was entitled to be discharged from his liability, or, as the instrument phrases it, “to discontinue his liability” for the future proceedings of James, remaining, however, liable for the balance-then due to Stinson, and for the delivering over of the other property then in his hands. Upon any other construction, Stinson and James, by any arrangement between themselves, as to continuing the agency, or as to not settling the accounts, or not requiring such balance or property to be paid or delivered, would have it in their power to defeat the whole intent of the instrument, and to hold Gass to an indefinite responsibility as surety. It seems to me, therefore, that the natural interpretation of the terms of the agreement is, that the proviso is not a condition precedent to the right of Gass to liberate himself from future suretyship, but is a qualification of the effect of the notice, as to his discharge from liability for antecedent proceedings under the agency.
The other point involves considerations of a very different nature; and in- one aspect would be decisive of the case against Stin-son. If, as Stinson in his answer, solemnly affirms, he gave no authority to the deputy warden to enter into this collateral agreement with Gass, and it was a stipulation on the part of Gass at the time of executing the bond, that it should be entered into, thus forming the substratum of his suretyship, it is very clear, that the bond and agreement must, as to Gass, be treated as nullities; for neither instrument in such a case could operate unless both did, the one being the motive for the other. But I am abundantly satisfied, that the collateral agreement, though executed after the bond, on the same day, was understood by all parties to be a part of the res gestae, and the very condition of Gass’s assuming the suretyship. And I am also as well satisfied, that as Stinson accepted and acted upon the bond with a full’ knowledge of the nature and effect of the collateral agreement without objection; and, indeed, as some of the evidence shows, with a positive adoption of the latter; it must be taken to be a final ratification of the whole-transaction on his part, and binding upon him. In the whole course of the subsequent: *66 negotiations and proceedings there is not a tittle of evidence establishing his disapproval of it.
We may now proceed to the examination of the other questions in the case. In respect to the first, viz. the change of the relation between Stinson and James, from that of a mex-e agency in the sale of granite to third persons, to that of a conditional purchase, or sale and return, I entirely agi-ee with the argument at the bar, that, if made out in point of fact, it is so total a departure from the trae nature of the original agency, and involves so much more responsibility and risk, that it will amount to a discharge of Gass; or rather, the transactions will fall without the condition of the bond. The difficulty is in coming to the conclusion, that the fact is precisely made out Stinson explicitly denies it in his answer. James as explicitly affirms it in his deposition. His competency as a witness in this case has beeix objected to; but I cannot perceive, what interest he has in the present suit, to which he is not a party, and by the event of which he can neither gain nor lose. If the plaintiff succeeds in the suit, James is not discharged from his liability; if he fails, the ■costs must be exclusively borne by the plaintiff. The case of Riddle v. Moss, 7 Cranch [11 U. S.] 206, is distinguishable. There the ■surety was sued at law on the bond; and his principal, who was offered as a witness, had made over his property to the surety to indemnify him for the event of that very suit The court on this account, as well as that his liability would be increased to the extent of the costs of the suit, if the judgment was for the plaintiff, held the principal an incompetent witness. It appears to me, however, as the result of the subsequent correspondence and acts of the parties, that the proposal contained in the letter of the T2th of February, 1831, by which Stinson proposed to change the former agreement, under which James was to receive a commission of five per cent upon his sales of granite, and to substitute a low price of the granite, so as to give James the full benefit of the extra price of the sales, was never definitely acted upon by either party. No account is shown, in which it was ever adopted as the basis of any settlement; and thex-e is a subsequent letter of James (8th of April, 1831,) in which he says “I. must have pay for trucking and cominissions on all I sell; unless, I cannot live.” go that it appears to me, that the denials of the answer ought under all the circumstances to prevail over the positive assertions of James on this point.
But this leads me to the consideration of the New Orleans contract, and whether it can be treated as a transaction within the scope of the agency. The nature of this transaction was as follows: On the 15th of August. 1831, a special contract was entered into between James and one Hastings (then his partner in business,) on the one part, and Reynolds and Zacharie of New Orleans of the other part, by which the fonner agreed to furnish the latter with all the stone for a bank building at New Orleans of certain specified dimensions and sizes, to be shipped at specified periods, for the gross amount of ten thousand dollars, under a penalty or rent (as it was termed) of five hundred dollars per month, for every month, which should elapse after the stated periods of shipment at Boston. After the making of this contract, which was made known to Stinson, James wrote from time to time to Stinson for such stone as he wanted for the undertaking; all of which was furnished to him by Stinson, and charged to him in account. It does not appear, that Stinson had any other participation in the New Orleans contract, than by supplying the stone fi-om time to time for the same. James in his bill insists, that Stinson agreed to furnish the stone at the periods stipulated in the contracts, and claims damages for losses sustained by him from his inability strictly to perform the same, in consequence of the default of Stinson. The answer of Stinson explicitly denies any participation in the contract. and any agreement to comply with its stipulations. Now, upon this posture of the case, the question arises, whether the stone, supplied to James under the then New Orleans contract, can properly, as against Gass, be deemed a part of the business of the agency, for which he is responsible. I think it cannot. So far as the supplies went to James avowedly to fulfil this contract, they must be treated as absolute sales to James or to James and Hastings, and not deliveries to James to be afterwards sold by him under the agency. It is impossible, that he could be at once agent and vendee; that he could negotiate as agent to sell to himself as purchaser. Reynolds and Zacharie never contracted at all with Stinson, directly or indirectly; but with James and Hastings only. Stinson, in making the supplies of stone to James treated him as the absolute debtor for the stone, as soon as received by him; and charged him therefor as pxxrchaser. A purchase is in no just sense an agency; a contract to sell to an agent is in no just sense a contract by an agent to sell for his principal. Not knowing the exact state of the accounts, between the parties, independent of this transaction, I am unable to say, what will be the effect of this view of the matter as to Gass’s responsibility.
I proceed, therefore, in the next place to the consideration of the question as to notice by Gass to Stixxson of his dissatisfaction with continuing his suretyship; and of the waiver of any formal notice by Stinson, and his assent to discharge Gass. It appears from the evidence, that at the time, when the bond was given, Gass was a stone-cutter in Boston in the employ of James, then a wharfinger in Boston, and concerned in the sale of stone. *67 . In September, or October, 1831, Gass left tbe regular employment of James, and set up business for bimself, which was a cause of dissatisfaction to James; and it is in a very high degree probable, that about this period, Gass intimated his wish to James to be absolved from his suretyship in future. On the 20th of September, 1831, James wrote a letter to Stinson stating, that Gass was going into the granite business soon; that he was daily interfering in contracts, that happened under his immediate observation; that he, James, felt well persuaded, that he had been a great injury to the sale of many stone on his wharf; and he then added:- “Entertaining the above views respecting his universal interference in my concerns, I have come to the conclusion to ask the favor of you to fill up a new bail-bond, and forward it enclosed in a letter by mail as early as possible, and immediately on my receiving it I will have it signed by a man, that will be satisfactory to you and all concerned, and remit it to you for your inspection. If the person is satisfactory to you, after you have made investigation, on the reference I shall ■offer respecting it, you will oblige by sending me the old bond, signed by Gass &c.” On the 20th of the same month the deputy warden replied: “If it will be of as much benefit, as you say it will, we have no objection to your changing your surety; all we want is to have things about right; and if Mr. Gass does not answer your purpose, you can get a better one. As soon as we can possibly get time we will send you a copy of the obligation, and you may see, what you ■can do with it.” On the 29th of September, 1831, the deputy warden wrote a letter to James, in which he said: “We have sent you a copy of the bond varying only, where it says, ‘for what may have been done since the 27th January.’ This variation will make it the same, as though it was signed at the time the other was written, and will agree with the commission you have, appointing you agent dated 27th January. You can get, who you please on the bond, one or two, as you like, and forward it; and if acceptable, we will exchange with you.” On the 4th of October, 1831, James enclosed the same bond with certain persons proposed in pencil as sureties. On the 9th of the same month, Stinson acknowledged the receipt of the bond, and added: “I can only say, the names of the sureties are strangers; presume they are good; but wish to have it to say to the executive, I know them to be good. Mr. T. or myself will be do\vn in all this month, and will then adjust the business satisfactorily.” This bond does not appear ever to have been executed or accepted. On the 13th of October, James wrote to Stinson: “If it would not discommode you, you would confer on me a favor, a great favor, to give up the old bond, as Mr. Gass considers me as .beholden to him on that account, and takes the advantage of it, having lately commenced the granite business near my wharf, and still expects me to employ his men at any price, he may choose to charge.” On the ICth of October, the deputy warden, in the absence of the warden, wrote to James, saying, that he could not say, what would be his (the warden’s) course respecting the bonds. “He does not know Mr. Sanborn, nor Mr. Hastings (the proposed sureties). All he wants is to be able to say to the directors, that the bond is perfectly good. If he can be satisfied, that they are good, he will willingly exchange with you. I shall be in Boston the last of this month, and then we can arrange it, I think.” On the 8th of November, 1831, the deputy warden wrote to James, saying: “We sent you the copy of the bond sometime since; have not heard any thing of it yet.” What bond this refers to, does not distinctly appear. On the 10th of November, James & Co. by their clerk, wrote to Stinson, saying: “We have received the bond; but have been so very busy with shipping stone, that I have not had time to attend to it; but will soon.” The bond here alluded to probably was the copy referred to in the letter of the 8th, and probably also was that, which was soon afterwards executed by one Amos C. Sanborn, and one Joseph. Hastings, as sureties, and was received by Stinson, and never afterwards returned to James. Stinson, however, in his answer, denies, that it was satisfactory to him or ever accepted by him; and says, that he retained it sometime in order to redeliver it to James, when he should come to Concord, (N. H.). But he does not pretend, that he ever returned this bond; and he says “he does not know what became thereof.” It is proved by Hastings and Sanborn, that the bond was never returned to them, and by James, that it was never returned to him; and that no notice was ever given to either, that it was not accepted by Stinson. On the contrary, James expressly asserts, that no dissatisfaction was ever expressed by Stin-son, respecting the sureties, and that on one occasion he expressed himself satisfied with the bond. Be this, as it may, it is very clear, that the bond was never returned to James, or the sureties; and I cannot but express myself under some difficulty in avoiding the conclusion, that its being retained affords some, if not cogent evidence, that it was satisfactory, and was in fact accepted. It was the duty of Stinson to return it forthwith, if he did not mean to accept it, and to give notice thereof to the parties interested in that bond. His omission to do so, under all the circumstances of the present case, cannot but afford a presumption, that it was accepted. I am aware, that the language of the letter of Stinson to James, of the 19th of April, 1832, leads to a different conclusion; and, indeed, it is the principal source of my doubts on the subject.
*68 But I should be sorry to place the decision of this part of the case upon the mere fact of an acceptance of the new bond, even if the presumption were stronger than It is, as I am of opinion, that the whole subsequent conduct of Stinson demonstrates, that he after-wards had full notice of the dissatisfaction of Gass in remaining a surety; that he waived any formal notice in writing of his (Gass’s) wishes to discontinue his suretyship; that he intentionally lulled Gass into the belief, that he required no other notice; that he had no claims on him under the old bond; and that he did not mean to insist upon any settlement according to the terms of the proviso. Under such circumstances, if clearly made out, there can be no doubt, that Gass is entirely discharged from his suretyship in regard to all transactions subsequent to that notice and waiver. The written correspondence of James & Stinson, in September, October, and November, 1S31, does, as I think, furnish a good deal of internal evidence of a knowledge on the part of Stinson, that Gass, as well as James, was then desirous of his being relieved from the suretyship; and, taken in connexion with the deposition of James and of the other witnesses for the plaintiff, there does arise a strong presumption of the fact, notwithstanding the rebutting evidence on the other side. Indeed, if the plaintiff’s depositions are to be believed, there is the most conclusive evidence, that Stinson repeatedly admitted, that he was willing to give up the old bond; and that he had no claim under it upon Gass; and that he excused himself from his repeated promises to deliver it up by subterfuges and evasive pretences, which varied at different times, but which all admitted, by implication, that Gass was entitled to be discharged. And, although the answer strenuously denies these allegations, I am not satisfied, that, in this respect, as well as in some other respects, it stands sufficiently supported to give it' entire credence.
But. what I rely on, is, that the answer itself admits, that in the spring of 1S32 (though not before) an application was made by Gass to Stinson, in Boston, to deliver up the old bond; and that he, Stinson, then stated to Gass, that he could not, consistently with his duty as a public officer, give up the original bond without receiving another with a satisfactory surety; that James had proposed substitutes, but none were satisfactory; and he, Stinson, was ready to receive a sufficient substitute. The answer also admits, that the brother of Gass did twice or thrice in Concord converse with him on the same subject, and for the same purpose. But it denies, that he, Stinson, ever promised to give up the bond, unless all the accounts were settled by James, the balance paid, and the remaining property of the prison delivered over to him. Now, without stopping, at present, to consider, whether the answer is, under all the circumstances, satisfactory on this head, it is material to state, that here notice is actually brought home to Stinson, in the spring of 1S32, of Gass’s dissatisfaction, and of his desire to discontinue his suretyship, and to have the old bond given up. No objection whatsoever was made as to the form or manner of the notice; and the objection to the delivering up of the old bond (which was a very different matter from the termination of the suretyship,) was put upon a distinct ground, not touched in the collateral agreement, and not required by it, viz. the giving of a new bond with new sureties. Stinson had no right to insist, that the new bond should be given before the discontinuance of Gass’s surety-ship, whatever he might insist on before a delivering up of the old bond. I think, therefore, that Stinson must be taken to have dispensed with any formal notice in writing by Gass of his intention not to be held to any suretyship for the future conduct of James in his agency.
There is a letter of the 19th of April, 1832, from Stinson to James, which shows, how earnestly Gass was at this time pressing his-claim to deliver up the bond. It begins thus: “Mr. Gass is pressing us hard to give up the bond. We know not what to do. Has sent to his brother J. P. Gass, two or three times, to come and see us; says he shall come up this week himself, if the bond is not sent. Had you not better see him, and say to him to remain easy. I know of no cause of his requesting this. I suspect he is not satisfied, because you do not employ him to cut stone. So far as I am interested personally, I should feel easy with your own paper. But you know the duty we owe the state. I hope you may get some good man; and let Mr. Gass off, as he is so anxious, &c. I think, however, if you say to Gass, you shall settle up in June or July, and then will get some one else, if we require it, he will be satisfied — I think he ought.” It is apparent from this letter, that Stinson had not, at that time, any intention to-revoke James’ agency,-or to close his accounts, or to insist upon the delivery up of the granite remaining in his hands. On the contrary, his object was to continue the agency, and to lull Gass into security. On the 4th of June, Stin-son wrote a letter to Gass, in which he says: “On my return home, I looked to the bond, and also to the certificate given you by Mr. Thompson (the deputy warden), which specifies the bond to be given up on ten days notice, provided the accounts be all settled, &c. By referring to the certificate you have of Thompson’s, you will see it, as above stated. You know whát I said to you, as to the propriety of our holding the bond, when I saw you the other day, and you yourself must be satisfied of the propriety of it. I am at a loss to know your anxiety to get it up, other than Mr. James’ not employing you to pre. pare stone. Mr. Thompson, or myself, will be in Boston soon, and shall then settle with Mr. James, and relieve you of an unnecessary anxiety.” On the same day Stinson wrote to *69 James, and said: “After I saw you, Mr. Gass pressed me hard for the bond, and demanded it as a matter of right I told him, why and wherefore I wished it, and the reasons I stated to you, &c. I tried to make him quiet; but he said, if I did not send the bond, he should come up this week. Would it not be well for you to see him, and say to him, that so soon as the New Orleans job was done, you should settle with us and discharge him. Of this course you will judge.” On the same day Thompson also wrote to James, and said: “Major Stinson wrote to-day to you about Gass; he also wrote to Gass. I think you need not be any worried about him, as he will be still, we think.” Now, it seems to me clear, from these letters, that Stinson was trying to lull Gass into security; that he was seeking to evade the just rights of Gass to a termination of his suretyship; and that he was postponing a final settlement of the accounts with James, in order to answer his own particular purposes. There is a total silence in all these letters as to any existing claim against Gass, under his suretyship.
If we pass from this documentary evidence to the testimonial evidence of the plaintiff, it is most manifest, if that evidence is believed, that Stinson had the fullest notice, that Gass wished to discontinue his surety-ship; that Stinson either had written notice thereof, or waived it; that he admitted Gass had fully entitled himself to the exercise of this right; that he lulled Gass into the belief, that he required no further notice; that he had no claim against Gass under the band; and that he would surrender the bond to him. There is some portion of the testimony of the defendant’s witnesses, which is in conflict with the testimony of the plaintiff’s witnesses on these points. But after making every deduction, I am constrained to come to the conclusion, that the weight of the evidence, as well as of the corroborative circumstances, is decidedly in favor of the plaintiff. It appears to me, that the latest period, to which the notice can be referred, and to which Gass’s liability can be prolonged, is the close of the month of April, 1832. The subsequent retainer of Gass’s bond was a violation of the reiterated promises, made to him, to deliver it up; and it was for purposes, and under pretences wholly beside any avowed intention to hold Gass responsible for any balance then due, or supposed to be due, from James. In short, the reasons assigned by Stinson for retaining the bond, according to the plaintiff’s witnesses (to which I on the whole give credit,) were of a na. ture wholly personal to Stinson, and excluded any notion of continuing liability on the part of Gass.
In cases of this sort, where a bond is given for the fidelity of a party for an indefinite period, I am aware, that it has been supposed, that at law the obligation created by the bond cannot be determined at the will of the surety by notice. That was intimated by Mr. Justice Bayley in Calvert v. Gordon, 7 Barn. & C. 809, and afterwards confirmed by the whole court, in the same case, in 3 Man. & R. 12-i. That doctrine may well be maintainable at law. I am aware, that the same doctrine seems to prevail in equity; for in the case of Gordon v. Calvert, before the vice chancellor (2 Sim. 253), and again in the same case, before the lord chancellor (4 Russ. R. 581), it seems to have been held, that notice would not terminate the liability; and that it was no more a defence in equity, than at law. I confess, that I should yield with more reluctance to this latter doctrine, though I am by no means prepared to say, that it is not maintainable. The case of Shepherd v. Beecher, 2 P. Wins. 28S, is distinguishable in several respects. In the first place, the father gave no notice, that he would not be liable on the bond for the future delinquencies of his son; but only requested, that the master would not trust him with any cash, at least, that he would do it sparingly. In the next place, the bond was for the fidelity of the son during the specified term of his apprenticeship of seven years. But it is wholly .unnecessary, in this case, to decide, what would be the effect of notice generally in equity in the case of a bond for an indefinite period; because, here, it is matter of express contract. And my judgment is, that, taking all the circumstances together, all the parties understood, that the liability of Gass as surety was terminated by a notice, sufficient for that purpose, at farthest at the close of the month of April, 1832; and that he ought not to be held responsible for any subsequent transactions under the agency of James.
It was suggested by the counsel for the defendant, in opening the argument, that the question as to the effect of the supposed change of the contract from a mere agency to a conditional purchase, or sale and return, was a defence open at law; and, therefore, not properly matter for equitable relief. That is true, if it constituted the whole matter of the bill. But the jurisdiction of a court of equity is invoked in this case for other purposes and other relief, for a discovery, for an injunction to the proceedings at law, and for other general relief upon all the merits, which a court of law is incompetent to administer. What I propose to do is, to refer it to a master, to ascertain the state of the accounts between Stinson and James upon the principles above stated, unless the parties agree to the statement annexed to the auditor’s report in the suit at law. If nothing shall appear to be now due to Stin-son from James, as a balance of accounts for any debts of the agency, contracted before the end of April, 1832, then Gass is entitled to be discharged altogether. If any balance is due, then he ought to be held liable therefor. Considering the suit at law as having been placed under the power of the court, for the purpose of administering substantial jus *70 tice between the parties, it appears to me, that that will be perfectly attained by accepting the auditor's report in that suit, and entering a joint judgment thereon against both James and Gass; and then to require Stinson to stipulate on record, not to execute any execution issuing on the said joint judgment against Gass, except for such sum as the court shall direct to be levied by its own order indorsed on the execution.
[For further proceedings, see Cases Nos. 5.201 and 5,202.]